# In the United States Court of Federal Claims

No. 14-84C

(Filed:  November 19, 2014)

|  |  |  |
|---|---|---|
| FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, et al. | ) ) ) ) | Tucker Act; 28 U.S.C. § 1491; Motion to Dismiss for Lack of Subject Matter Jurisdiction; RCFC 12(b)(1); Waiver of Sovereign Immunity; Privity of Contract; Equitable Subrogation; General Liability Insurer; Miller Act Surety. |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

*Richard L. McConnell*, Wiley Rein, LLP, Washington DC, for plaintiff.  With him was *Brendan J. Morrissey*, Of Counsel.

*Lauren Springer Moore*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington DC, for defendant.  With her on the briefs were *Marian E. Sullivan*, Assistant Director; *Robert E. Kirschman, Jr.*, Director; and *Stuart F. Delery*, Assistant Attorney General.

## OPINION AND ORDER

**Kaplan, Judge.**

The plaintiffs in this case are Fidelity and Guaranty Insurance Underwriters, Inc., and United States Fidelity and Guaranty Company (collectively "USF&G").  USF&G seeks reimbursement from the government for legal expenses and settlement costs it incurred in its capacity as general liability insurer for Gibbs Construction, L.L.C. f/k/a Gibbs Construction Co. ("Gibbs"), a government contractor.  It alleges that as part of a 1984 contract to renovate a post office in New Orleans, Louisiana, the United States Postal Service ("USPS" or "Postal Service") agreed to indemnify Gibbs and its agents against any liability or expenses incurred as a result of asbestos removal work under the contract, but that USPS breached that agreement.  USF&G maintains that it is "Gibbs's equitable subrogee in the amount of $1,560,583.34, and acceded to all claims Gibbs might have with respect to the underlying legal expenses and loss up to that amount."  Am. Compl. ¶ 32, ECF No. 16 (May 9, 2014) (hereinafter "Compl.").

The defendant, United States of America (hereinafter "the government"), has moved to dismiss USF&G's complaint for lack of subject matter jurisdiction under the Rules of the Court

of Federal Claims ("RCFC") 12(b)(1).  For the reasons stated below, the government's motion to dismiss is **GRANTED**.

**BACKGROUND[1]**

In 1984, USPS awarded Gibbs, a general contractor, a contract for the abatement of asbestos and fireproofing of the main Post Office in New Orleans, Louisiana.  Compl. ¶¶ 5-6.  Gibbs in turn contracted with Laughlin-Thyssen, Inc. f/k/a Laughlin Development Corporation ("LTI") for the asbestos removal portion of the project.  Id. at ¶ 7.

On November 26, 1985, during the course of performance under the contract, Gibbs advised USPS that, due to unanticipated delays caused by USPS, it was having difficulty procuring general liability insurance that would cover asbestos removal at an affordable price for the remainder of the project.  Compl. ¶¶ 10, 11.  Therefore, Gibbs asked USPS to provide additional consideration to cover the procurement of additional insurance.  Id.  Instead, USPS agreed to execute an addendum to the contract.  Compl. ¶ 13.  The addendum, executed on March 12, 1987, stated as follows:

ASBESTOS REMOVAL/REPAIR LIABILITY

> The Postal Service shall save harmless and indemnify the contractors and its officers, agents, representatives, and employees from all claims, loss damage, actions, causes of action expense and/or liability resulting from brought for or no account of any personal injury received or sustained by any person persons attributable to the asbestos' removal work performed under or related to this contract.

Compl. ¶ 14 (typographical and grammatical errors in original).  The addendum was signed by W. Bruce Powell, Jr., the USPS contracting officer with responsibility for the project.  Compl. ¶ 15.

In the meantime, USF&G had issued three general liability insurance policies to Gibbs, which were in effect during three successive annual policy periods from January 1, 1985 through January 1, 1988.  Compl. ¶ 17.  Gibbs completed work on the contract to the satisfaction of USPS in June 1988.  Compl. ¶ 19.

On March 25, 2010, a former USPS Police Officer filed suit against Gibbs and LTI, alleging that he contracted mesothelioma as a result of his occupational exposure to asbestos during the asbestos removal and fireproofing project between September 1984 and January 1988.  Compl. ¶ 20.  Gibbs demanded that USPS defend and indemnify Gibbs with respect to the

---

[1] For the purpose of resolving defendant's motion to dismiss, the Court assumes the allegations in plaintiffs' amended complaint are true.  See Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (In deciding a motion to dismiss for lack of subject matter jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint.").

lawsuit, but USPS rejected that demand.  Compl. ¶¶ 21, 22.  According to USF&G, after USPS failed and refused to comply with its obligations under the addendum, Gibbs demanded that its insurers, including USF&G, defend and indemnify it in the lawsuit. Compl. ¶ 23.  The lawsuit ultimately was settled, with Gibbs and its insurers together paying $1,375,000 to the USPS employee.  Id.  USF&G paid a total of $1,560,583.34 in legal expenses and settlement costs in the lawsuit.  Compl. ¶¶ 23, 32.

After the settlement, Gibbs again tendered a demand to the USPS contracting officer on July 30, 2012, seeking indemnification for the amounts paid by Gibbs and its insurers in defending and settling the lawsuit.  Compl. ¶ 24.  The contracting officer denied Gibbs's claim on January 29, 2013.  Compl. ¶ 25.

USF&G, as equitable subrogee to Gibbs, commenced this action against the government on January 29, 2014, with jurisdiction predicated upon the Tucker Act, 28 U.S.C. § 1491.  Compl. ¶ 4.  It contends that USPS's breach of the contract with Gibbs and refusal to defend and indemnify Gibbs against the USPS employee's claim forced Gibbs and its insurers to pay extensive legal expenses and settlement costs that they would not otherwise have had to pay, and that were the obligation of USPS under the contract.  Compl. ¶¶ 27-32.

The government filed its motion to dismiss for lack of subject matter jurisdiction on May 28, 2014, arguing that this Court lacks subject matter jurisdiction over the present action because plaintiffs are not in privity of contract with the government.  Def.'s Mot., ECF No. 19 (May 28, 2014).  Oral argument was held on the motion on November 13, 2014.

## DISCUSSION

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff.  Trusted Integration, 659 F.3d at 1163.  The court may "inquire into jurisdictional facts" to determine whether it has jurisdiction.  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).  The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013).

The Court of Federal Claims has jurisdiction under the Tucker Act to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2012).  The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), but it does not confer any substantive rights.  United States v. Testan, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision.  Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

Although claims for damages arising out of a contract with the United States are squarely within the express terms of the Tucker Act, 28 U.S.C. § 1491(a), the "government consents to be

3

sued only by those with whom it has privity of contract." Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984).  Therefore, as a general matter, "[a] plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim." S. Cal. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 (Fed. Cir. 2005).

The Federal Circuit has recognized "limited exceptions" to the requirement that parties seeking relief for breach of contract against the government under the Tucker Act must be in privity of contract with the United States. Id. (citing First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999)).  These limited exceptions include (1) actions against the United States by an intended third-party beneficiary; (2) pass-through suits by a subcontractor where the prime contractor is liable to the subcontractor for the subcontractor's damages; and (3) actions by a Miller Act surety for funds that the government improperly disbursed to a prime contractor. First Hartford Corp. Pension Plan & Trust, 194 F.3d at 1289. As the court of appeals has observed, "the common thread that unites these exceptions is that the party standing outside of privity by contractual obligation stands in the shoes of a party within privity." Id.; see also S. Cal. Sav. & Loan Ass'n, 422 F.3d at 1328.

In this case, USF&G is not in privity of contract with the government.  It contends, however, that it falls within one of the limited exceptions to the privity requirement because it is asserting rights to sue that were assigned to it by operation of law as an equitable subrogee of a government contractor.  Pl.'s Resp. 8-9, ECF No. 22 (July 3, 2014).  USF&G thus analogizes its status to that of a Miller Act surety who has taken over contract performance or financed completion of a defaulted contract and whose standing to sue the United States under the Tucker Act, based on the doctrine of equitable subrogation, is well established.  See Lumbermens Mut. Cas. Co. v. United States, 654 F.3d 1305, 1320-21 (Fed. Cir. 2011); Ins. Co. of the West ("ICW") v. United States, 243 F.3d 1367, 1375 (Fed. Cir. 2001); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1161-63 (1985).

USF&G's contentions are unpersuasive.  The doctrine of equitable subrogation is triggered in the case of a Miller Act surety "when the surety takes over contract performance or when it finances completion of the defaulted contract." ICW, 243 F.3d at 1370.  As the court explained in ICW, "[a] surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government)." 243 F.3d at 1370 (citing Balboa, 775 F.2d at 1160).  "If the surety fails to perform, the Government can sue it on the bonds." Id. (quoting Balboa, 775 F.2d at 1160).  Likewise, because the surety assumes the remaining obligations of performance, it may also assume the rights of the contractor to obtain payment from the government. See Balboa, 775 F.2d at 1160-61.  "[T]he triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" Lumbermens Mut. Cas. Co., 654 F.3d at 1312 (quoting Balboa, 775 F.2d at 1161).  At that point, the surety "step[s] into the shoes of a Government contractor" and may "rely on the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491, and bring suit against the United States." ICW, 243 F.3d at 1369.

While it is well established that a surety may bring suit against the United States under a theory of equitable subrogation, neither the Court of Federal Claims nor the Federal Circuit has

ever recognized a waiver of sovereign immunity under the Tucker Act in a case like the present one, in which a general liability insurer invokes the doctrine of equitable subrogation to step into its insured's shoes for purposes of suing the government for breach of contract. To the contrary, in the cases in which the issue has been raised, Tucker Act jurisdiction has been found lacking. See Travelers Cas. & Sur. Co. of Am. v. United States, 103 Fed. Cl. 101,104-05 (2012); Federal Ins. Co. v. United States, 29 Fed. Cl. 302, 304-08 (1993).

In that regard, the Court finds Judge Andewelt's reasoning in Federal Insurance persuasive. In that case, the plaintiff provided general liability insurance to a government contractor that had designed mailboxes for USPS. 29 Fed. Cl. at 303. After paying settlements and judgments to several government employees allegedly injured by the mailboxes in question, it brought an action against the United States under the Tucker Act as the contractual and equitable subrogee of the contractor. Id. at 302-303. Plaintiff claimed that it was required to make payments to the injured employees because USPS had breached its contractual obligations to, among other things, inspect and maintain the mailboxes so that they met operational and safety standards. Id. at 303. Relying upon Balboa and related cases, as well as United States v. Aetna Casualty & Surety Company, 338 U.S. 366 (1949), it asserted jurisdiction under the theory that the principle of equitable subrogation permitted it to step into the shoes of the contractor and pursue those claims that the contractor could have brought against USPS in its own name. Id. at 304.

Judge Andewelt rejected the plaintiff's argument, noting that Balboa and related cases "do not stand for the proposition that in enacting the Tucker Act, Congress intended the concept of equitable subrogation to be applied broadly to Tucker Act contract cases." Id. "To the contrary," the court observed, "the rationale for finding a waiver of sovereign immunity for government contract sureties in such cases appears narrow in scope and would not apply to a general liability insurer like plaintiff." Id. In particular, he explained, "[a] general liability insurer such as plaintiff is by no stretch of the imagination 'as much a party to the Government contract as the contractor.'" Id. at 305 (quoting Balboa, 775 F.2d at 1160). Further, he noted, "[a] general liability insurance contract does not result in a 'three-party agreement' analogous to a surety arrangement." Id. at 305. Instead, the insurance contract "creates rights and obligations that run exclusively between Bonus-Bilt, the contractor, and plaintiff, the insurer." Id. "The Postal Service is not a party to that insurance agreement[,] and the agreement does not create any obligations that run directly between the Postal Service and plaintiff." Id. Thus, "if [the contractor] failed to perform the contract work, the Postal Service could not look to plaintiff to complete the work, i.e., the insurance agreement does not render plaintiff 'liable for [the contractor's] debt or duty [to the Postal Service]." Id. In short, "[a] surety arrangement is a unique and distinct type of arrangement" because "[b]y agreeing through a performance bond to assume all of the contractor's burdens and obligations for contract performance, a surety, in a sense, is the alter ego of the contractor from the government's perspective." Id. In other words, "[a] surety not only steps into, but also completely fills, the shoes of the contractor." Id. By contrast, the court noted, the subrogation provision in the insurance contract in Federal Insurance "amounts to no more than a contingent assignment of a right to sue the government." Id. at 305-306. Thus, Judge Andewelt concluded,

In this context, plaintiff's analogy to surety cases must fail. The Balboa court's interpretation that the Tucker Act authorizes suit by a person who is "as much a party to the Government contract as the contractor" would hardly demand the conclusion that Congress also intended to authorize suit by parties who have no direct responsibility for contract performance and no other obligation owed directly to the government. Plaintiff's relationship to the government seems far better analogized to that of a subcontractor, which the Balboa court reasoned "has no obligation[ ] running directly to or from the Government . . . and therefore possesses no enforceable rights against the United States."

Id. at 306 (quoting Balboa, 775 F.2d at 1160).

USF&G's central contention in this case is that Judge Andewelt's analysis is no longer viable in light of language the Federal Circuit used in ICW when it reaffirmed the holding in Balboa. According to USF&G, ICW stands for the broad proposition that the Tucker Act's waiver of sovereign immunity extends to contract claims against the United States brought by any assignee that has acquired rights by operation of law. Pl.'s Resp. 8. This would include a general liability insurer, like USF&G, that has paid an insured contractor's claims pursuant to the insurance contract and who invokes the doctrine of equitable subrogation as a basis for bringing suit against the United States. The Court finds the plaintiffs' reliance upon ICW as creating a new exception to the requirement of privity of contract unpersuasive.

The specific issue presented in ICW was the same issue that had been presented in Balboa: whether a surety, "after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491, and bring suit against the United States." ICW, 243 F.3d at 1369. As noted above, Balboa and other cases had previously established that "a surety could recover from the United States payments made to a contractor after the surety had notified the government of the contractor's default." Id. at 1369-70 (referring to Balboa, 775 F.2d at 1161-63). Nonetheless, in ICW, "the government argued that the Supreme Court's decision in Department of the Army v. Blue Fox, Inc., 525 U.S. 255 (1999), had effectively overruled Balboa and these other cases." Id. at 1370. Specifically, the government relied on a passage in Blue Fox which stated that the three Supreme Court cases upon which Balboa had relied in finding sovereign immunity waived in the context of a surety's assertion of a right to equitable subrogation in fact involved disputes between private parties. Id. at 1371-72. The government "seize[d] upon [this] passage to argue that there is no waiver of sovereign immunity for sureties' equitable subrogation claims." Id. at 1371. The court of appeals rejected the government's argument. It reaffirmed the reasoning and holding in Balboa, concluding again that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States," and confirmed that Balboa "correctly states the law of equitable subrogation." Id. at 1375, 1375 n.5.

There is nothing about the holding in ICW that undermines the reasoning of Federal Insurance or requires an expansion of the limited categories of claims for which privity of contract is not required. In fact, the opinion in ICW discusses the reasoning of Balboa at length and, as noted, closes with an explicit endorsement of Balboa's statement of the law of equitable

subrogation.  USF&G nonetheless seizes upon certain general observations that the court of appeals made in <u>ICW</u> with respect to how to apply the Supreme Court's ruling in <u>Aetna Casualty & Surety Company</u>, a case arising under the Federal Tort Claims Act, to cases under the Tucker Act.  It urges that these statements undermine the fundamental distinctions that the court in <u>Federal Insurance</u> drew between suits by sureties and those by liability insurers.  Pl.'s Resp. 10-11.  In particular, USF&G argues, <u>ICW</u> made the point that, like the Federal Tort Claims Act, the Tucker Act must be interpreted to "waive[] immunity as to <u>claims</u>, not claimants."  Pl.'s Resp. 8 (citing <u>ICW</u>, 243 F.3d at 1373).  The Federal Circuit thus recognized, USF&G argues, that "[n]either the Federal Tort Claims Act nor the Tucker Act is limited to claims asserted by the original claimant."  <u>ICW</u>, 243 F.3d at 1373.

USF&G's contention that this language supports its standing to sue here is unpersuasive.  Besides the fact that this language (and indeed much of the discussion of <u>Aetna Casualty & Surety Company</u> in <u>ICW</u>) appears to be dicta (see discussion below), the reason USF&G lacks standing in this case is not simply because it is not the "original claimant" (<u>i.e.</u> not in privity with the government).  Rather, it lacks standing because, unlike a surety, it has not stepped completely into the shoes of the contractor.  Here, unlike the plaintiff in <u>ICW</u> or the plaintiffs in <u>Balboa</u> and related cases, USF&G did not owe any contractual obligations to the United States or vice versa.  Its contractual obligations were to its insured, Gibbs.  Therefore, USF&G did not step into the shoes of the contractor (or "original claimant") in the same sense that the court of appeals concluded that the sureties had done in <u>Balboa</u>, <u>ICW</u>, and related cases.

In contending that <u>ICW</u> pronounced a broad rule recognizing a waiver of sovereign immunity for equitable subrogees even if they do not fully step into the shoes of the contractor, USF&G relies upon language in <u>ICW</u> which expansively characterized the Court's ruling in <u>Aetna</u> and its application to the Tucker Act.  <u>See</u> Pl.'s Resp. 8 ("<u>Aetna</u> reflects a broader and more generally applicable legal principle: waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant" (quoting <u>ICW</u>, 243 F.3d at 1373)).  The Court agrees with the other judges of the Court of Federal Claims who have described this expansive language as dicta unnecessary to the otherwise narrow holding in <u>ICW</u>.  <u>Travelers Cas. & Sur. Co.</u>, 103 Fed. Cl. at 104; <u>Nelson Constr. Co. v. United States</u>, 79 Fed. Cl. 81, 88 (2007); <u>Centers v. United States</u>, 71 Fed. Cl. 529, 533 (2006); <u>Commercial Cas. Ins. Co. of Ga. v. United States</u>, 71 Fed. Cl. 104, 108 (2006).

Indeed, it is worth noting that each of the court of appeals' decisions that have since discussed <u>ICW</u> in any detail has characterized the holding in that case as merely reaffirming the longstanding doctrine of equitable subrogation set forth in <u>Balboa</u>, and has explained that the basis for that holding was the fact that—upon notifying the government of the contractor's default—sureties fully step into the shoes of the defaulting contractors for purposes of contractual obligations running both to and from the government.  <u>See, e.g.</u>, <u>Lumbermens</u>, 654 F.3d at 1312-13; <u>Nat'l Am. Ins. Co. v. United States</u>, 498 F.3d 1301, 1307 (Fed. Cir. 2007); <u>Fireman's Fund Ins. Co. v. United States</u>, 313 F.3d 1344, 1351-52 (Fed. Cir. 2002).  None has suggested that <u>ICW</u> stands for the broader proposition urged here, creating an exception to the privity requirement for all equitable subrogees, even those like USF&G that have not assumed

any obligations under a contract with the United States.  This Court, therefore, declines to give a broad reading to ICW that would create an additional exception to the well-established requirement of privity of contract as a basis for standing to sue under the Tucker Act.

### CONCLUSION

On the basis of the foregoing, the government's motion to dismiss for lack of subject matter jurisdiction is **GRANTED** and the complaint is dismissed without prejudice.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge